*Monique Williams v. Mayor and City Council of Baltimore City*
No. 3095, Sept. Term, 2018
Opinion by Leahy, J.

**Municipal Corporations > Negligence > Notice**

The "mere fact that [a] municipality knows" of a defective hydrant "does not ordinarily include notice of a particular danger at any point"; rather, "there must be actual or constructive notice of [a] particular defect or obstruction." *See Weisner v. Mayor and Council of Rockville*, 245 Md. 225, 229 (1967) (citing 19 McQuillin, Municipal Corporations, § 54.114 (3d ed. 1950)).

**Municipal Corporations > Negligence > Notice**

The law imputes constructive notice based on the circumstances of a particular case. *City of Annapolis v. Stallings*, 125 Md. 343, 347 (1915) (citation omitted).

**Municipal Corporations > Negligence > Summary Judgment**

The circuit court did not err in granting summary judgment in favor of the municipality where the plaintiff failed to produce sufficient evidence that a leaking hydrant created a dangerous roadway condition that caused her accident, even though the plaintiff did provide evidence that the hydrant itself was defective.

Circuit Court for Baltimore City
Case No. 24-C-17-004488

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3095

September Term, 2018

_____

MONIQUE WILLIAMS

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE CITY

_____

Leahy,
Wells,
Sharer, J. Frederick
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  April 7, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

In the early morning on November 25, 2015, Monique Williams, appellant, applied her brakes as another car pulled in front of hers on Franklin Square Drive. At that moment, her vehicle began to sway and then slid in a circular motion before landing on its side. Ms. Williams remained in the flipped vehicle until paramedics arrived to remove her. Subsequently, the paramedics transported Ms. Williams to Franklin Square Hospital where she was treated for multiple injuries.

In 2017, Ms. Williams filed a complaint alleging two counts of negligence in the Circuit Court for Baltimore City, naming the Mayor and City Council of Baltimore City (the "City") as one of the defendants. In her complaint, Ms. Williams alleged that she lost control of her vehicle and sustained personal injury because a fire hydrant, for which the City was responsible, was leaking water and created a dangerous condition on Franklin Square Drive. On a motion for summary judgment filed by the City, the circuit court ruled that, although the City had notice of the defective condition of the hydrant, the City was entitled to summary judgment because Ms. Williams failed to meet her burden to show that "water or ice or some other defect in the roadway was the cause" of her accident.

Ms. Williams timely noted her appeal from the court's grant of summary judgment in favor of the City. She presents one question for our review:

> "Did the trial court err in granting Baltimore City's Motion for Summary Judgment on the grounds that there was insufficient evidence to establish that the dangerous condition was a cause of Ms. Williams'[s] accident?"

For the reasons that follow, we hold that the trial court did not err in granting summary judgment in favor of the City.

## BACKGROUND

## The Leaky Hydrant

During the fall of 2015, the City received notice of a leaking fire hydrant on Franklin Square Drive near the intersection with King Avenue.[1]  A work order dated October 30, 2015 indicates that a Baltimore City Department of Public Works (DPW) employee investigated the location and referred the hydrant to the maintenance department to have the hydrant "overhauled."  As explained by Gary Billups, a utility investigator for DPW who was deposed by Ms. Williams's counsel, "overhaul" means to "put in a new hydrant because that one is not functioning right."  The October work order had a priority of "medium."  Jammie Booker, a supervisor with DPW who was also deposed, articulated the meaning of "medium priority":

> It means something is broken and needs attention, but it's not – I would say it wouldn't be, like, extreme but when you get a high priority job, I guess that's when it's a broken main, and people are not getting water.  Any time water is not being distributed to the consumer or a hydrant not there to put out a fire, those are high priority jobs.  Public safety.

On November 2, 2015, the City logged a citizen service request for a "water break" "at the intersection of king avenue and franklin square drive."  The citizen indicated that the water was coming from the "Street" and the water flow was "Heavy."  A responding DPW employee observed a "leaking hydrant" at the location.  On November 17, 2015, the

---

[1] The portion of Franklin Square Drive where the accident occurred is located in Baltimore County.  However, Baltimore City is responsible for water service at that location and the fire hydrant in question was the City's responsibility. *See Department of Public Works*, BALT. CTY. GOV'T, https://www.baltimorecountymd.gov/Agencies/publicworks/index.html (last visited Feb. 13, 2020).

2

City received another citizen service request, which stated "Hydrant is on Franklin Square Dr (on NW side of Rd), NE of King Ave. Looks like it may have been recently replaced, it is leaking all over the road." A DPW employee arrived the next day, November 18, and observed that "there were no leaks, no noise." The employee "[g]reased the operating nut" and noted "[c]lean-lines." Both the work order from October 30 and the service request from November 2 were marked as "Closed" to reflect that the work had been performed. On November 19, the City received a citizen service request identical to the request from November 17. That same day, both were marked as "Duplicate (closed)" which, Mr. Billups explained, indicates that a request was for "the same location, and someone had been there, and then closed it out" after performing the work.

Another citizen service request for a leaking hydrant at the location "between Franklin [S]quare Dr & Baltistan Ct & [K]ing [A]ve" was logged on November 23, 2015. Mr. Billups responded the next day, November 24, and noted "There is a leaking valve at this location – making medium water – no damage." Mr. Billups explained that "medium water" means "[i]t's not a real heavy flow of water. It's just barely coming out of the street or either the valve." In response to a question about whether medium water "would refer to water that you could see with your naked eye on the street," Mr. Billups indicated that, although not a heavy flow, it was a "constant flow" of water. Mr. Billups defined "no damage" as "[n]o damage done to the street[.]" He further stated that his job duty after observing "medium water" and "no damage" would be to "call and report it to the valve truck."

3

During his deposition almost three years later, Mr. Billups testified that he did not remember responding on November 24, 2015 (the day before Ms. Williams's accident), but that, based on the Service Request Summary Report, he knew he went to the location for a leaking valve. According to Mr. Billups, if he had noticed that the "medium water" had created an icy condition on the road, he "would [have] let [dispatch] know it was an icy condition that needed immediate response" and "put cones out." Because the report did not indicate the presence of an icy condition, Mr. Billups testified, it was correct to say that the leak was not creating an icy condition on that date.

At her deposition, Ms. Williams testified that she had seen water coming out of the hydrant "periodically"—"more than once" as she drove to and from work. She explained:

> This problem with the hydrant was on and off for a while. Sometimes you would see water. Sometimes you would not see water. Maybe within a month or so, maybe sometime in October, sometime in November. So I don't really have exact dates.

With regard to the water coming out of the hydrant, she stated, "It wasn't a little leak. It was enough where I could visibly see. While I'm driving, I can see water coming out of it." Although she "felt like [the hydrant] should be fixed," Ms. Williams "never called anyone to see about getting it fixed." She emphasized that "[i]t wasn't every single day"; rather, "it was periodically."

**The Accident**

Sometime between 6:30 and 7:30 a.m. on November 25, 2015, the Wednesday before Thanksgiving, Ms. Williams drove her 2003 Chevy Trailblazer to Sam's Club to pick up peanut oil for the turkey she planned to cook the next day. The weather, as Ms.

4

Williams recalled, was that of "a regular November day": "It was kind of early in the morning. There was no sun out. It was cold. I know it was cold, because I had a cloak." She did not "recall it being windy" that morning. Though there were two routes she could take for the ten-minute drive to Sam's Club, Ms. Williams chose to go down Franklin Square Drive, which has two lanes in each direction. The road was clear, and Ms. Williams did not remember seeing any traffic or encountering any problems on her way. She also did not see any crews working on the street at that time. After shopping for around 30 minutes, she left Sam's Club, again taking the Franklin Square Drive route. As Ms. Williams approached the turn to her neighborhood, she was in the far-right lane, with the hydrant near the King Avenue intersection three lanes to her left.

Ms. Williams recalled that, when she was "no more than two minutes" away from home, another car got over in front of her. She had been driving "anywhere from 30 to 35 miles per hour," about the speed limit on Franklin Square Drive. Although the car did not cut her off, she "made sure [she] applied brakes to have appropriate spacing, so [she] wouldn't hit them." Ms. Williams did not see any brake lights or notice the car skid or slide as it moved in front of her. Then, maybe a "few seconds" after she applied her brakes, Ms. Williams "just started experiencing sliding." Ms. Williams explained:

> When I was experiencing the sliding, I just felt the [Trailblazer] start to sway and **it hit me, like, Oh, man, this is ice.**
> So I know that my father has taught me, you're on ice, you don't want to hit your brakes anymore because it can go out of control. So I'm just trying to steer my way to make sure that I don't have an accident.
> At that time – it all happened really fast – the car began to go in a circle, a turning type of motion. It just turned. When it hit the sidewalk, it kind of flipped over. It jumbled. The big thing is I just remember the car

5

swaying.  I remember feeling like I was going in some type of circular motion or something and hitting the curb, and everything else is kind of a blur.

(Emphasis added).

At her deposition, Ms. Williams could not recall if there was another car next to her, what speed she had slowed down to, or whether she was turning the steering wheel.  She did remember that she did not take her hands off the wheel, and that she was not "pumping the brakes[.]"  She testified as to her thoughts at the time her car was sliding: "It must be something like ice or something on the road, because you wouldn't do this normally when you're driving and apply your brakes.  I've never experienced that before."  According to Ms. Williams, from the time she left Sam's Club until the time of her accident, she was watching the road and "did not see anything on the road."

Ms. Williams called 911 from her flipped vehicle and paramedics arrived to remove her.  Although she had no problems answering the paramedics' questions, she noted at her deposition that she was unsure whether she was conscious the entire time:

> That part is a little unclear to me because it took a while for the fire department to come and the paramedics to come, the reason being, there was another incident with the ice.  Someone had slipped.  They apologized for taking a long time.
> So when they came, they just talked to me a little bit.  They were familiar about some of the icy patches that were going on there, because they had an issue earlier.

The paramedics transported Ms. Williams to Franklin Square Hospital, where she was treated for multiple injuries before being released in the evening.

The City responded to the faulty hydrant again on November 25, 2015.  A DPW employee noted that there was "a split on the lead line creating a broken main."  Ms.

6

Williams saw the crews working on the hydrant from the car on her way back from the hospital.

## Ms. Williams's Complaint

On August 25, 2017, Ms. Williams filed her complaint, alleging one count of negligence against the City.[2] The complaint stated that Ms. Williams's vehicle spun out of control due to "water and black ice which had formed . . . due to a suspected water main break" on Franklin Square Drive near the intersection with Baltistan Court. Ms. Williams asserted that the City has a duty to "keep its public streets in repair and to give adequate warnings if it knew or should have known of any defective or unsafe conditions that have not been repaired yet." The City breached its duty, Ms. Williams continued, by "initiating but failing to reasonably and completely complete the water repair work" and by "not providing adequate and reasonable warnings to the public of the dangerous and unsafe condition of the roadway, that it knew or should have known existed[.]" Ms. Williams further alleged that, as a result of the City's negligence, "a vehicle collision caused by the water and black ice without any warning signs was a foreseeable result."

## The City's Motion for Summary Judgment

The City filed a motion for summary judgment on September 18, 2018, almost a month after the close of discovery. The City argued that "no dangerous or hazardous

---

[2] The second count of the complaint alleged negligence against Baltimore County. On a motion for summary judgment filed by the County, the court determined that there was insufficient evidence to establish that Baltimore County had notice of the defective condition on the roadway because the fire hydrant was the responsibility of Baltimore City. Thus, the circuit court granted the County's motion, and Ms. Williams does not challenge the court's decision on appeal.

condition was present in the roadway of Franklin Square Drive due to a fire hydrant expelling water onto the roadway on the morning of Nov. 25, 2015." In support, the City referred to Ms. Williams's deposition testimony that she didn't see "any stream" or ice in front of her as she approached the location of the accident, and that the vehicle driving ahead of her did not encounter any condition. The City further contended that it lacked notice of water or ice on the roadway on the morning in question, and that a municipality must have actual or constructive pre-injury notice of the existence of a hazard in order to be held liable by an injured individual. According to the City, it was entitled to judgment as a matter of law due to the lack of evidence of negligence on its part and evidence of notice of the fire hydrant expelling water on November 25, 2015.

Ms. Williams filed a memorandum in opposition to the City's motion for summary judgment and a statement of material facts in dispute. In her memorandum, she requested that three inferences be made in her favor: (1) that the City "never performed reasonable and adequate repair of the leaking fire hydrant"; (2) that the "water running into the street the day before [her] accident was never turned off or remedied prior to her vehicle losing control and rolling over the next morning"; and (3) that "whether or not other vehicles encountered problems is not relevant absent a showing that the other vehicles also applied their brakes while crossing over the roadway in question." Ms. Williams also pointed to "three major genuine disputes as to [] material facts":

> whether there are adequate facts to support [a] finding that (1) Baltimore City had notice of the leaking fire hydrant, (2) whether it responded in a reasonable manner in repairing or warning of the dangerous condition[,] and (3) whether the Plaintiff could and should have seen the water and ice in the roadway.

8

Ms. Williams included in her statement, as additional material facts in dispute, "[w]hether a reasonable person under the circumstances would have seen the water and ice on the roadway" and "[w]hether the vehicle immediately in front of the Plaintiff's vehicle would or should have lost control."

Ms. Williams asserted that the City had notice because it received several complaints about a leaking hydrant, including a complaint from the day before her accident, in response to which Mr. Billups went to the scene and observed "medium water." She also argued that whether or not she "could or should have observed water or ice in the roadway in the early morning of November 25, 2015, is a material fact in dispute that must be left for a jury to decide." Accordingly, she concluded that summary judgment was not appropriate because "sufficient facts and favorable inferences exist[] to support a jury finding that [the] City had notice of the leaking hydrant, failed to take appropriate remedial action and that the water and ice in the roadway was a proximate cause of [her] injuries."

The court held a hearing on the City's motion on October 24, 2018. Counsel for the City argued that Ms. Williams was "in the best condition to speak to the state of the roadway," yet she testified "clearly that on the way back, on the way there, she doesn't see anything in the roadway." Further, counsel contended, the record was "devoid of any evidence to substantiate a hazardous or dangerous condition that the City would be responsible for." According to counsel, it was "very illustrative" that another vehicle that moved "from the left lane to directly in front of [Ms. Williams] in the far right lane, so it

9

was as far as possible from the hydrant[,] . . . encountered no difficulty in traveling down the roadway."

Though "not, in and of itself, positing contributory negligence," counsel told the court, "[w]e can't exclude that Ms. Williams could have done anything to contribute to the accident." Res ipsa was also inapplicable, the City argued, because, *inter alia*, the City did not have exclusive control over the hydrant, and there was a lack of evidence that "anything regarding the hydrant was in fact the cause of the accident." Lastly, counsel argued that the City did not have the requisite pre-injury notice to be held liable, as "time is the most crucial aspect of constructive notice" but there was no evidence of how long any hazard had existed.

In turn, Ms. Williams's counsel referred to the multiple complaints filed by citizens and asserted that the November 24, 2015 report stated "there was medium water in the street" to support her argument that the City had notice. Counsel told the court, "[U]nder a summary judgment, where we're at right now, I believe the Court has to take the view favorable to the Plaintiff. That the water wasn't shut off the night before. A clear record that the City knew that there was a water issue."

The court noted that Ms. Williams's arguments went only to notice and whether the City had a duty:

> What's the evidence of causation? That's the piece I'm missing. That it was some type of water or ice in the roadway that caused this accident. Because when I read [Ms. Williams's] deposition, she said she didn't see anything. So how do we even know that this was the cause of the accident? What's the evidence in the record of that?

Ms. Williams's counsel responded,

10

The evidence in the record would be right where her vehicle lost control was right where the hydrant and the water issues were. . . . And immediately when she tapped her brakes, that's when she lost control of the vehicle.

So that raises an inference that she lost control of her vehicle because of the water and ice on the roadway.

Counsel offered to supplement the summary judgment record with the police report which "put[] that there [wa]s black ice on the scene," and told the court that Ms. Williams planned to "bring at trial people who arrived on the scene" to testify about the temperature and icy condition. Because the City "was clearly on notice," counsel concluded, "[w]hether or not this dangerous condition caused or contributed 100 percent to Ms. Williams'[s] accident" should be left to the jury to decide.

In rebuttal, the City asserted that Ms. Williams "had every opportunity to fill the record with anything, with witnesses, that would have provided additional testimony" but did not procure testimony about ice or water at the scene. Counsel for the City contended that the record was "devoid of any causal connection and any actual evidence, testimony, or documentary record within this case that there was anything occurring with the fire hydrant on that morning that would have resulted in an accident."[3]

**The Court's Decision**

At the close of the hearing, the court decided to take the City's motion for summary judgment under advisement. The court declined to take a position on Ms. Williams's request to supplement the record and told counsel, "if that's what you wish to do, then

---

[3] The City clarified for the court that the scheduling order had been modified and the parties engaged in additional fact discovery before the extended discovery deadline of August 27, 2018.

11

you'll have to file a motion." However, Ms. Williams's counsel did not file any motion or otherwise supplement the record.

Two weeks later, on November 8, 2018, the court granted the City's motion for summary judgment in a written order. The court noted that the "record reveals that the City had actual notice of the defective condition of the fire hydrant." The inquiry did not end there, the court continued, as a "municipality will only be held liable where plaintiff can establish that it had actual or constructive notice of the bad condition that caused the damage." The court reviewed Ms. Williams's and Mr. Billups's testimony and concluded that "[t]here is simply insufficient evidence to establish that water or ice or some other defect in the roadway was the cause of the motor vehicle accident involving Ms. Williams on November 25, 2015."

Ms. Williams timely noted her appeal from the court's grant of summary judgment on December 7, 2018. We will include additional details in the discussion below.

## DISCUSSION

Ms. Williams argues before this Court that the trial court erred in granting summary judgment for four reasons. First, she contends, the court "ignored and never addressed whether it found or did not find that material facts in genuine dispute exist" so the memorandum order, "on its face, fails to satisfy the requirements necessary for a trial court to grant a [m]otion for [s]ummary [j]udgment and is legally incorrect." Second, Ms. Williams asserts that material facts in genuine dispute did exist. Third, according to Ms. Williams, the court was required to draw inferences of fact in her favor yet, "in finding that insufficient evidence of a dangerous condition existed, had to lean and favor the []moving

12

party Baltimore City to get to that conclusion." Finally, Ms. Williams contends that she "provided sufficient evidence at this stage in the case that a reasonable jury may find that the water running across the roadway may have been a proximate cause of her vehicle losing control." (Emphasis omitted).

The City responds that the trial court correctly granted its motion for summary judgment because Ms. Williams "produced no evidence that ice or water from the fire hydrant caused her accident" and "failed to provide evidence sufficient to show that the City had prior notice of the alleged hazard that allegedly caused the accident – the ice on the road[.]"

**Standard of Review**

A circuit court may grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Md. Rule 2-501(f). "We review a circuit court's decision to grant summary judgment without deference, by independently examining the record to determine whether the parties generated a genuine dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law." *Colbert v. Mayor & City Council of Baltimore*, 235 Md. App. 581, 587 (2018). In doing so, "[w]e review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Kennedy Krieger Inst., Inc. v. Partlow*, 460 Md. 607, 632-33 (2018) (citation omitted). "[O]rdinarily, an appellate court will review a grant of summary judgment only

13

upon the grounds relied upon by the trial court." *Hamilton v. Kirson*, 439 Md. 501, 523 (2014) (citation omitted).

## I.

### No Genuine Dispute of Material Fact

Ms. Williams contends that "material facts in genuine dispute exist[,]" as the "parties genuinely dispute whether Baltimore City had notice of the dangerous condition." She further asserts that "[w]hether Baltimore City had notice of the leaking hydrant is a factual determination which should be left to a jury to decide." The City "does not dispute that it had actual notice of an intermittently leaking hydrant prior to the accident." Accordingly, the circuit court properly determined that no factual dispute existed with regard to notice of the defective hydrant. Because the City posits that it "received no notice until after the accident" of the "hazard that allegedly caused the accident"—the "unreasonably slippery road conditions" and not the leaking hydrant—we must determine whether the circuit court erred in finding that there was no dispute of material fact as to whether the City had actual or constructive knowledge of the dangerous roadway condition. *See Colbert*, 235 Md. App. at 588.

As this Court explained recently, in general, "a municipality has a duty to maintain its public works in good condition," but the duty is not absolute. *Colbert*, 235 Md. App. at 588. Indeed, "[i]f an entity is injured because the municipality failed to maintain its public works and the municipality had actual or constructive notice of the bad condition that caused the damage, the municipality may be held liable in negligence." *Id.* Accordingly, Ms. Williams "was required to show that [the City] had actual or constructive notice" of

14

the "bad condition that caused the damage" in order to establish negligence. *Id.* The law imputes constructive notice based on the circumstances of a particular case. *City of Annapolis v. Stallings*, 125 Md. 343, 347 (1915) (citation omitted). A municipality will be found to have constructive notice "when the evidence shows that—as a result of the 'nature' of a defective condition or the 'length of time it has existed'—the municipality would have learned of its existence by exercising reasonable care." *Colbert*, 235 Md. App. at 588 (citation omitted).

As the party opposing a motion for summary judgment, Ms. Williams had a burden to "show disputed material facts *with precision* in order to prevent the entry of summary judgment." *Macias v. Summit Mgmt., Inc.*, 243 Md. App. 294, 315 (2019) (citing *Warsham v. James Muscatello, Inc.*, 189 Md. App. 620, 634 (2009)) (emphasis added). "[M]ere general allegations which do not show facts in detail and with precision are insufficient to prevent summary judgment." *O'Connor v. Baltimore Cty.*, 382 Md. 102, 111 (2004) (citation omitted). Moreover, although we resolve all inferences in favor of the party opposing summary judgment, "those inferences must be reasonable ones." *Kirson*, 439 Md. at 523 (citation and alterations omitted).

In *Weisner v. Mayor and Council of Rockville*, the Court of Appeals considered "whether or not there was any evidence produced at the trial from which the jury may have drawn a reasonable inference that the appellee had either actual or constructive notice of the alleged icy condition of the sidewalk." 245 Md. 225, 228 (1967). The Court cited a treatise for the following proposition:

Where the cause of injury is snow or ice, the rule that there must be actual or constructive notice of the dangerous condition applies the same as in case of other obstructions or defects, with the same exception that no notice is necessary where the accumulation is caused by acts of municipal officers. **But the mere fact that the municipality knows of a heavy fall of snow, or a freeze after a thaw, does not ordinarily include notice of particular danger at any point. In such case it seems there must be actual or constructive notice of the particular defect or obstruction.**

*Id.* at 229 (emphasis added) (citing 19 McQuillin, Municipal Corporations, § 54.114 (3d ed. 1950)). Further, the Court instructed,

The law would also appear to require a showing that the condition at the place of the accident was more perilous than the general condition of sidewalks throughout the municipality and that the particular situation had prevailed for such a period of time that the city should have known about it and failed to take steps to remedy it.

*Id.* at 229-30.

Looking at the facts before it, the *Weisner* Court emphasized that the "specific sidewalk in question had actually been cleared of snow, and at the time of the accident it appeared cleared of ice according to the appellant's own testimony." *Id.* at 232. Thus, the Court concluded,

in effect what the appellant is asking this Court to do is to find that there was evidence from which the jury might have drawn a reasonable inference, that the municipality knew or should have known, that a thin sheet of ice was forming on this specific sidewalk, in the early morning hours, as a result of the freezing of water which was draining from the adjacent snowbanks and that this rendered the sidewalk in question more perilous than sidewalks generally throughout the municipality.

*Id.* at 232-33. The Court held that applying constructive notice to the case "would result in the exposure of the municipality to an unreasonable and unrealistic norm of liability." *Id.* at 233.

16

In the case before us now, Ms. Williams sets forth a theory of constructive notice similar to the theory presented by the appellant in *Weisner*, arguing that "[t]he jury has to look at the dates of the complaints, work orders, listen to the testimony of the employee who investigated the scene the night before the accident and all other facts that would be produced at trial to determine whether Baltimore City had notice." Despite the volume of evidence presented to show that the City had notice of the faulty hydrant, we conclude that Ms. Williams failed to present evidence giving rise to an inference that the City had constructive notice of water or ice across the roadway.

Ms. Williams points to the separate complaints the City received about the hydrant and emphasizes Mr. Billups's observation of "medium water." She asserts that Mr. Billups "observed medium water running through the street" and that nothing in the record shows that a valve truck was called to address the "constant medium flow of water across the street." Mr. Billups's testimony, however, clarifies that he did not observe water running *through* or *across* the street. Rather, his observation of "medium water" indicated that there was water "just barely coming out of the street or either the valve." Mr. Billups also testified that he would have "let the dispatcher know to refer [a] leaking valve to the valve truck, and let them know what type of water was coming from the valve, if it was a little bit of water, medium water, or heavy flow[,]" but notice of "medium water" on November 24, 2015 did not alert the City to the existence of a "bad condition that caused the damage" on November 25, 2015.

In addition, Ms. Williams testified that she did not see, or encounter, any water or ice when she passed the hydrant on her way to Sam's Club on November 25. She further

17

testified that she did not see anything on the roadway when she passed the hydrant on the opposite side of Franklin Square Drive on her way home. Thus, regardless of Mr. Billups's observation of "medium water" the day before, there is nothing in the record to show that, at the time Ms. Williams alleged to have encountered water or ice, the "particular situation had prevailed for such a period of time that the city should have known about it and failed to take steps to remedy it." *Weisner*, 245 Md. at 229-30. The "mere fact that the municipality knows" of a defective hydrant "does not ordinarily include notice of a particular danger at any point"; rather, "there must be actual or constructive notice of [a] particular defect or obstruction." *See id.* at 229 (citing 19 McQuillin, Municipal Corporations, § 54.114 (3d ed. 1950)). Accordingly, in the absence of other admissible evidence, we hold that Ms. Williams did not create a genuine factual dispute about whether the City had constructive notice of any hazardous roadway condition, or "bad condition that caused the damage." *See Colbert*, 235 Md. App. at 588.

Contrary to Ms. Williams's argument that the "trial court ignored and never addressed whether it found or did not find that material facts in genuine dispute exist," the court did analyze whether a genuine factual dispute existed with regard to constructive notice. The court determined that the City had "actual notice of the defective condition of the fire hydrant," but noted that the inquiry was not over. The court proceeded to look at the testimony of Ms. Williams and Mr. Billups, before concluding that Ms. Williams "failed to produce any evidence to show that there was water or ice in the street where the accident occurred on the morning of November 25, 2015," as would be required to impute constructive notice to the City.

18

## II.

## Judgment as a Matter of Law

"Summary judgment is appropriate if the nonmoving party has failed to make a sufficient showing of an essential element of its case with respect to which it has the burden of proof." *Zilichikhis v. Montgomery Cty.*, 223 Md. App. 158, 186 (2015) (citation and internal brackets omitted). To avoid a grant of summary judgment in favor of the defendant, a plaintiff must support his or her claim with "more than a scintilla of evidence, as there must be evidence upon which a jury could reasonably find for the plaintiff." *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 108 (2014) (citation and internal brackets and quotation marks omitted).

A plaintiff must establish four elements to state a claim of negligence in Maryland: "a duty owed to him or her (or to a class of which he or she is a part), a breach of that duty, a legally cognizable causal relationship between the breach of the duty and the harm suffered, and damages." *Kennedy Krieger Inst., Inc. v. Partlow*, 460 Md. 607, 633 (2018) (citing *Kiriakos v. Phillips*, 448 Md. 440, 456 (2016)) (internal brackets omitted). As was noted, a municipality generally "owes a duty to persons lawfully using its public streets and sidewalks to make them reasonably safe for passage," and if "a person is injured because a municipality failed to maintain its streets," the municipality may be held liable in negligence if it had "actual or constructive notice of the dangerous condition that caused the injury[.]" *Smith v. City of Baltimore*, 156 Md. App. 377, 383 (2004).

The circuit court concluded that summary judgment in favor of the City was appropriate because Ms. Williams did not provide sufficient "evidence to establish that

19

water or ice or some other defect in the roadway was the cause of [her] motor vehicle accident[.]" Ms. Williams argues that she did provide sufficient evidence at the summary judgment stage to allow the case to go to the jury. She relies on the "constant medium flow of water across the street the day before [she] lost control of her vehicle"; a "[r]easonable inference" that the water remained at the time she lost control; her testimony that "[i]t must be something like ice or something on the road" and that she began sliding after applying her brakes; and testimony from Jamir Foster and Jael Samuel, who were identified in her Answers to Interrogatories as witnesses to the slippery conditions of the roadway.

In considering Ms. Williams's argument, we keep in mind the requirement that "the facts presented must not only be detailed but also admissible in evidence" in order to properly oppose a motion for summary judgment. *Zilichikhis*, 223 Md. App. at 176-77 (citation omitted). And, although we resolve all inferences in favor of the party opposing summary judgment, the inferences must be reasonable. *Hamilton v. Kirson*, 439 Md. 501, 523 (2014) (citation and alternations omitted). As we noted above, Mr. Billups's testimony did not establish that there was a flow of water across Franklin Square Drive on November 24, 2015 that created a hazardous condition. Moreover, Mr. Billups testified if he had noticed an icy condition on the road, he "would let [dispatch] know it was an icy condition that needed immediate response" and "put cones out." We note that there is no evidence in the record as to what the temperature was on the morning of November 25, 2015.

Ms. Williams's testimony that "[i]t must be something like ice or something on the road" was a theory rather than a factual assertion, so it cannot support an inference of any dangerous condition. *See O'Connor v. Baltimore City*, 382 Md. 102, 111 (2004).

20

Similarly, the witnesses identified in Ms. Williams's interrogatories as individuals who saw the slippery conditions cannot form the basis of an inference in her favor, as the witnesses did not put forth any assertions based on their own personal knowledge. *See Zilichikhis*, 223 Md. App. at 180. The evidence before the circuit court was that no other cars encountered any dangerous roadway conditions, Ms. Williams did not see any water or ice, and she drove down Franklin Square Drive on the side closest to the hydrant earlier on the same day without issue. In the absence of admissible evidence to the contrary, there was nothing to support Ms. Williams's contention that approximately 30 minutes later there was a hazardous condition on the side of the road furthest from the hydrant. Although Ms. Williams provided evidence that the hydrant was defective, she did not provide sufficient evidence that the hydrant created a dangerous roadway condition that caused her accident.

We discern no error in the circuit court's determination that Ms. Williams failed to produce any evidence that water from the hydrant created an icy or hazardous condition that caused her accident. Accordingly, we hold that the court granted summary judgment correctly in favor of the City.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

21